NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONNELL LINTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No.: 06-5080 (JLL) |
| v. ) | |
| ) | **OPINION** |
| L'OREAL USA, ) | |
| ) | |
| Defendant. ) | |

**LINARES, District Judge.**

This matter comes before the Court on the motion [CM/ECF #20] for summary judgment of Defendant L'Oréal USA, Inc. ("Defendant" or "L'Oréal") filed September 9, 2008. Also before the Court at this time is Plaintiff Donnell Linton's ("Plaintiff" or "Linton") cross-motion [CM/ECF #28] for summary judgment filed November 3, 2008. No oral argument was heard. Fed. R. Civ. P. 78. For the reasons set forth herein, Defendant's motion for summary judgment is granted and Plaintiff's is denied.

### INTRODUCTION

Linton began working for L'Oréal in September of 1980 as a Packaging Operator in L'Oréal's plant in Piscataway, New Jersey. (Def. 56.1. Statement ¶ 7.) L'Oréal eventually promoted Linton to the position of Processing Supervisor at the Piscataway plant in 1989. (Id. ¶ 12.) The Piscataway plant operated three shifts, each with its own Processing Supervisor. (Id. ¶ 15.) At all times relevant to Linton's Complaint, he supervised the third shift, from 10:00 P.M.

to 6:00 A.M.  (Id. ¶ 13.)

In 2004, Linton injured his knee, and took an approved medical leave for arthoscopic surgery.  (Id. ¶¶ 16-19.)  Approximately one year after returning from that leave, Linton sprained his left ankle playing basketball.  (Id. ¶ 25.)  Rather than telling his employer the actual cause of his injury, however, he told L'Oréal that he hurt his ankle moving furniture.  (Id. ¶ 27.)

After his injury, Linton sent L'Oréal a communication from his physician, Dr. Winell, that he would be absent from work from June 30, 2005 through July 8, 2005 due to a second degree ankle sprain.  (Id. ¶ 26, 38.)  L'Oréal approved his leave.  (Id. ¶ 28.)  Linton sent L'Oréal another document from Dr. Winell on July 7, 2005, stating that he would not return to work until further medical evaluations had been performed.  (Id. ¶ 30.)  L'Oréal sent Linton a memo describing their policies with respect to the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.: the memo stated that Linton could have up to twelve weeks of leave but that he was responsible for periodically apprising L'Oréal of his status and communicating his intent to return to work.  (Id. ¶ 31.)  L'Oréal covered Linton's shift by having other personnel work overtime.  (Id. ¶ 31; Curry Dec. Ex. 3 at 19.)

Linton made one phone call during his leave to his supervisor, Jefferson Howell, and stated that he did not know how long he would be on leave; this was Linton's only direct contact with L'Oréal during his 2005 leave prior to his termination.  (Def. 56.1 Statement ¶¶ 33-34, 50.)  On several occasions, however, he sent documents to L'Oréal.  (Id. ¶¶ 39, 40, 43, 45, 47, 49.)  These included forms completed by Dr. Winell after July 19, August 2, August 17, and August 31 examinations.  Each form indicated that Linton would continue leave.  (Id. ¶¶ 40, 42, 44, 46, 48.)  In the August 31, 2005 form, Dr. Winell indicated that Linton would remain on leave until

2

September 30.  (Id. ¶ 48.)

Linton's treatment for the ankle sprain involved ice, elevation, a removable cast, crutches, and physical therapy.  (Id. ¶¶ 35-36.)  His condition permitted him to do some walking and to travel, including on one occasion to Puerto Rico.  (Id. ¶¶ 36-37.)

Linton's twelve weeks of "permitted" leave ended September 23, 2005, while Linton remained out pursuant to the August 31 office note from Dr. Winell.  (Id. ¶ 56.)  Linton failed to report to work on September 23, 2005, and L'Oréal's Director of Human Resources, Gabrielle Gillespie ("Gillespie") terminated Linton via a September 26, 2005 letter.  (Id. ¶¶ 58, 61.)  L'Oréal replaced Linton the following day.  (Id. ¶ 63.)

On September 30, 2005, Dr. Winell cleared Linton to return to work on October 3.  (Id. ¶ 64.)  After this appointment, Linton called L'Oréal's Gillespie and left a message on her voicemail alerting her that he was ready to return to work. (Pl. 56.1 Counter-Statement ¶ 65.)  In a conversation on September 29, Gillespie advised Linton that his position had been filled, but that he could apply for other positions at L'Oréal; she reiterated these points in letters dated October 5, 2005 and November 2, 2005.  (Id. ¶ 66; Def. 56.1 Statement ¶¶ 66, 68-69.)  Linton did not apply for any positions at L'Oréal, and sought work elsewhere. (Def. 56.1 Statement ¶¶ 70-71; Pl. 56.1 Counter-Statement ¶ 71.)

Linton filed his Complaint in this Court on October 23, 2006.  After discovery, L'Oréal filed the instant motion to dismiss with respect to all four counts of Linton's Complaint.  The parties then stipulated the dismissal of the first two counts of the Complaint, for violation of the Family and Medical Leave Act and disability discrimination under N.J.S.A. ¶ 10:5-1 et seq. (the "NJLAD"), leaving only two NJLAD claims for failure to engage in the interactive process and

3

failure to accommodate. Linton then cross-moved for summary judgment. Before the Court at this time, therefore, are the parties' motions for summary judgment with respect to Linton's claims for failure to engage in an interactive accommodation process under the NJLAD and for failure to accommodate under the NJLAD.

## DISCUSSION

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings. See Celotex, 477 U.S. at 324. Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

In order to demonstrate a prima facie case of disability discrimination for failure to

4

accommodate under the NJLAD,

> a plaintiff must first present the prima facie elements required in any LAD disability discrimination claim, that is: (1) plaintiff was disabled within the meaning of the statute; (2) plaintiff was qualified to perform the essential functions of the position of employment; and (3) plaintiff suffered an adverse employment action because of the disability.

Victor v. State, 952 A.2d 493, 504 (N.J. Super. Ct. App. Div. 2008).  If there is a claim that the employer failed to engage in an interactive process concerning accommodation, that argument goes to the second factor of the prima facie case.  Victor, 952 A.2d at 504.  New Jersey courts have developed an independent test to determine whether an employer failed to engage in the interactive process:

> To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Tynan v. Vicinage 13, 798 A.2d 648, 657 (N.J. Super. Ct. App. Div. 2002).  The interactive process itself under the NJLAD has been borrowed from the federal regulations under the Americans with Disabilities Act (the "ADA"), and consists of an informal interaction between the employer and the employee identifying potential reasonable accommodations geared to the individual employee's situation.  Tynan, 798 A.2d at 657; Victor, 952 A.2d at 503.  The burden is first upon the employee to request assistance, and then upon the employer to come up with potential accommodations.  Tynan, 798 A.2d at 657.

Although Linton sets forth his surviving NJLAD claims in two separate counts, the teaching of the Appellate Division in Victor indicates that the remainder of the Complaint is best analyzed as a single count with alternative arguments as to the second element of the prima facie case. 952 A.2d at 504. This Court will, therefore, proceed to analyze Linton's Counts Three and Four as a single claim for failure to accommodate under the NJLAD.

### A.     Disability and Adverse Employment Action

Defendant does not challenge either the first or last elements of the NJLAD prima facie case. (Def. Br. at 15-18, 20-24.) This Court finds both that Plaintiff's ankle sprain constituted a "handicap" for purposes of the NJLAD, satisfying the first element, and that his termination was a sufficiently adverse employment action to establish the third element of his prima facie case. See Nieves v. Individualized Shirts, 961 F. Supp. 782, 796 (D.N.J. 1997) (finding that varicose veins constitute sufficient handicap under the NJLAD); Carlson v. Twp. of Lower Alloways Creek, No. 06-3779, 2008 WL 5109745, at *5 (D.N.J. Dec. 2, 2008) (termination an adverse employment action under the NJLAD); Pl. Opp. Br. at 6. This Court finds, therefore, that the only element of the prima facie case upon which summary judgment turns is the second element.

### B.     Qualification to Perform Essential Functions

L'Oréal moves for summary judgment based on its argument concerning Linton's inability to meet the second element of an NJLAD failure to accommodate claim. First, L'Oréal asserts that Linton's continued absence after the end of his leave renders him unqualified to perform his position. (Def. Br. at 15-16.) Second, L'Oréal argues that Linton never initiated the interactive process by requesting an accommodation, therefore absolving it of its duties under

6

Tynan. 798 A.2d at 657; Def. Br. at 21, 23.  Linton maintains that under the Tynan failure to accommodate test, he can demonstrate that he was qualified to perform his position; that L'Oréal had an affirmative duty under the NJLAD to offer further accommodations to Linton as the end of his approved leave approached; and finally that leave of more than twelve weeks would have been reasonable under the NJLAD and should have been offered.  (Pl. Opp. Br. at 7-8, 15-18, 19, 27.)  This Court will first examine the parties' conduct under the failure to accommodate test.

### 1. The Employee's Request for Accommodation or Assistance Subsequent to His Initial Request

The sharpest disagreement between the parties on the instant motion concerns the second element in Tynan's failure to accommodate test: whether the employee made a request for accommodation or assistance.  798 A.2d at 657.  New Jersey law places the duty on the employee to initiate the request for reasonable accommodation.  Id.  It does not, however, require any specific formula for that request: its essence is a clear request for assistance with a disability.  Tynan, 798 A.2d at 656-57.

After Plaintiff requested, and was granted his initial request for an accommodation, the only record evidence claimed by Linton as subsequent requests to extend his medical leave accommodation, are the notes from Dr. Winell.  Plaintiff argues that these notes sufficed as a request for accommodation, and that L'Oréal was not entitled to await a more express request for assistance during the medical leave period before engaging in the interactive process.  (Pl. Opp. Br. at 21, 39.)  According to Linton, the series of notes from Dr. Winell provided sufficient notice that he required some additional accommodation due to his continued inability to return to work.  (Id. at 24.)

After reviewing the cases cited by the parties on this issue, this Court finds that Plaintiff's proposed application of Tynan's "clear request" language would read the second prong out of the test for failure to accommodate in a great many cases. Under Plaintiff's theory, every employer with knowledge that an employee was out with an injury such as a sprained ankle, would be forced to engage in the interactive process even in the absence of a clear request for assistance, or possibly even any request at all.

The Supreme Court of New Jersey has not squarely addressed this issue. However, to interpret the type of form supplied by the physician in this case as a request for accommodation on behalf of an employee would have the result of shifting the burden to begin the interactive accommodation process to the employer.

The NJLAD is a remedial statue, and is to be construed liberally. Victor, 952 A.2d at 502-03. The facts presented here, however, are distinguishable from those in Butlemeyer v. Fort Wayne Community Schools, upon which Plaintiff relies. 100 F.3d 1281, 1282, 1286 (7th Cir. 1996). In Butlemeyer, a mentally ill school custodian obtained a letter from his psychiatrist stating, "due to Bob's illness and his past inability to return to work, it would be in his best interest to return to a school that might be less stressful than Northrop High School." 100 F.3d at 1282. The Butlemeyer plaintiff then submitted the letter to the administration the day of his termination, and the Seventh Circuit found that the administration should have engaged in the interactive process under the ADA rather than go through with the termination. Id. at 1286.

Here, Linton was given permission to take twelve weeks of leave for his ankle sprain, despite originally only having asked for six to eight weeks through Dr. Winell. (Caldwell Dec.

Ex. 14.) Linton then communicated with L'Oréal by forwarding Dr. Winell's office notes. (Caldwell Dec. Ex. 11, 13, 14, 19, 22-26.) It was not until the twelve weeks had expired that L'Oréal terminated Linton. (Caldwell Dec. Ex. 17.) In order to have activated the interactive process, the notes need not have made a suggestion as to a reasonable accommodation, or even used the words "reasonable" or "accommodation." Tynan, 798 A.2d at 657. However, these notes must somehow indicate that an additional reasonable accommodation was being sought. Dr. Winell's office notes are devoid of any requests: they provide dates and diagnosis, but make no express or implied request on behalf of Linton regarding an accommodation other than ask that Linton be excused from work. (Caldwell Dec. Ex. 11, 13, 14, 19, 22-26.) In fact, there is a box on the office note used by Dr. Winell with check-off lines requesting such accommodations as light duty work or elevator privileges. No such request is made on any of the forms. (Caldwell Dec. Ex. 11, 13, 19, 22-26.) Nor is the Department of Labor form completed by Dr. Winell, in which Dr. Winell indicates that Linton would likely heal in 6-8 weeks but could neither work nor wear safety shoes, a request for accommodation which occurred after the exhaustion of the twelve weeks. (Caldwell Dec. Ex. 14.) In fact, that form was the medical corroboration required by L'Oréal when it granted Linton the original accommodation of medical leave. (Id.)

The "clear request" language in Tynan was drawn from the Third Circuit's ADA jurisprudence. 798 A.2d at 657. Tynan cited Jones v. United Parcel Service for the proposition that an employee must make clear his or her request for assistance. 214 F.3d 402, 408 (3d Cir. 2000). In Jones, an employee became disabled due to a back injury, but after two years, was cleared to return to work. 214 F.3d at 403. When he refused to return to work, the employer

9

filed a petition to end his worker's compensation benefits; after it was eventually granted and finalized, the employee rejected offers of sedentary jobs with the employer and sued under the ADA for failure to accommodate. Id. at 403-04. The Jones court found that the employee never requested an accommodation, and, notably, rejected the employee's "constructive notice" theory of accommodation request:

> Jones never requested an accommodation or assistance for his disability; he not only never requested to return to his old position as a package car driver, he never asked for either one of the other jobs available under his union contract or any other position with UPS. Appellant nevertheless contends that UPS had "sufficient constructive notice of Mr. Jones' desire for accommodation," because it was aware of Jones's belief that he could not return to his former manual labor job and that his disability precluded him from returning to work at UPS. We disagree because appellant has not provided any evidence to suggest that UPS should have known that Jones sought an accommodation.

Id. at 408 (internal citation to brief omitted).

In so finding, Jones distinguished an earlier failure to accommodate case upon which Linton seeks to rely, Taylor v. Phoenixville School District. 184 F.3d 296 (3d Cir. 1999). In Taylor, a school secretary became severely disabled after the onset of bipolar disorder. 184 F.3d at 302-03. The secretary's son communicated to the school that his mother "would require accommodations when she returned to work" and reported her condition and contact information for physicians who had treated her. Id. The Taylor court separated the request for accommodation test into two prongs: the employer's awareness of the disability and the employee's request. Id. at 313-14. The Court found that the affidavit of the secretary's son stating that he had sought accommodations for his mother sufficed to meet both prongs of the

request requirement and invoke the interactive process. Id. at 314.

Here, the difference between Linton and the Taylor plaintiff is that here there is no evidence that Linton made any request for accommodation other than the initial medical leave request which he in fact received. For this court to apply a constructive notice theory to the final note prior to Linton's leave expiring on September 23 would be to ignore Jones and Taylor. 214 F.3d at 408; 184 F.3d at 313-4. Something more is required of an employee under the NJLAD than merely apprising her employer that she is still injured to start the interactive process for seeking an accommodation; the employee must at least arguably seek assistance to survive summary judgment. This Court therefore grants summary judgment to Defendant on the issue of whether Linton requested any further accommodation after July 18, 2005, when L'Oréal granted his original request for leave. (Caldwell Dec. Ex. 14.)

## 2. Continuing the Interactive Process

The Court now turns from the second prong of the Tynan failure to accommodate test to the fourth prong, namely that "(4) the employee could have been reasonably accommodated but for the employer's lack of good faith." 798 A.2d at 657. Once the interactive process has begun, "both parties have a duty to assist in the search for a reasonable accommodation and to act in good faith." Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997) (emphasis added). The remaining arguments of the parties go to the issue of whether or not Linton and L'Oréal acted in good faith once the initial request for accommodation had been made by Linton on June 30, 2005.

In this case L'Oréal accepted the June 30, 2005 form as an original request for

accommodation and granted Plaintiff medical leave as an accommodation. Thus, the Plaintiff argues, the interactive accommodation process had begun and L'Oréal had a duty to continue said process in good faith. This Court has already granted summary judgment on the issue of whether Linton requested any further accommodation. See supra, Part B.1. Therefore, the only issue that remains is whether, having granted an original medical leave accommodation of twelve weeks, L'Oréal was under a continuing duty to continue the interactive process in good faith, when it became apparent that Plaintiff would exceed his twelve weeks of permitted leave. (Pl. Opp. Br. at 18, 27-28.) L'Oréal, according to Linton, concedes that granting a brief additional leave would have been reasonable, and that L'Oréal failed in its duty to consider further accommodation under the NJLAD. (Id. at 18.) L'Oréal argues that an indefinite leave is a legally unreasonable accommodation under the NJLAD and that it was Linton who abandoned the interactive process. (Def. Reply Br. at 10, 13-14.)

New Jersey courts hold that indefinite leave is not a reasonable accommodation. Svarnas v. AT&T Comm., 740 A.2d 662, 673 (N.J. Super. Ct. App. Div. 1999); Winters v. Sharp Electronics Corp., No. 6105-05T5, 2008 WL 680732, at *9 (N.J. Super. Ct. App. Div. 2008) (unreported). The Third Circuit has also addressed the concept of indefinite leave as an accommodation under the ADA and found it wanting, albeit in unreported decisions. Krensavage v. Bayer Corp., No. 06-4302, 2008 WL 177802, at *4 n.1 (3d Cir. 2008) (unreported) (ADA claim) ("Thus, the failure to grant her indefinite leave could not constitute a failure to make a reasonable accommodation of her disability."); Fogelman v. Greater Hazleton Health Alliance, 122 F. App'x 581, 586 (3d Cir. 2004) (unreported). Despite the unreasonability of indefinite leave, shorter periods of leave can be reasonable depending upon the facts of a

12

specific case.  Svarnas, 740 A.2d at 673.  In the case at bar it is clear that once L'Oréal granted the initial accommodation the interactive process had begun and both parties had a good faith duty to assist in the search for the reasonable extension of the initial accommodation should that become necessary.

    Here, this Court finds that contrary to the contentions of both parties, triable issues of fact exist regarding the interactive process engaged in by the parties after the initial accommodation was granted.  Linton on the one hand provided no information to L'Oréal as to when he could return to work as the end of his leave approached. (Caldwell Dec. Ex. 26.)  Dr. Winell's note of August 31, 2005, states that Linton could not work and that his next appointment would be September 30, 2005; this of course was after his twelve weeks of granted leave would end.  (Id.) At that appointment, Linton was indeed cleared to work, however, by that time L'Oréal had already unilaterally terminated him.  (Caldwell Dec. Ex. 17, 19.)  It should also be noted that L'Oréal had never provided Linton with a specific end-date for his leave, requiring him to make the twelve-week calculation himself.  Linton then notified L'Oréal, through the August 31 office note of Dr. Winell that he would be out on leave past the end date for his approved leave. (Caldwell Dec. Ex. 14.)  Examining these facts in a light most favorable to Linton, a reasonable factfinder could find that L'Oréal, who had already granted an initial accommodation, and was presumably aware of Dr. Winell's note of August 31, 2005, did not act in good faith in the interactive process by unilaterally terminating the Plaintiff on September 26, 2005, about one week prior to the date Plaintiff was cleared to return to work.  See Cahill v. Parkway Ins. Co., No. 5579-03T2, 2005 WL 2708087, at *4 (N.J. Super. Ct. App. Div. 2005) (unreported) (reversing dismissal of NJLAD claim because plaintiff need not provide date certain to return to

work).

On the other hand, a reasonable trier of fact could find instead that it was the Plaintiff who had failed in his duty to assist in the search for an appropriate accommodation and to act in good faith by failing to specifically request an additional accommodation and by failing to contact L'Oréal with anything other than his doctor's office notes until he was terminated. See Winters, No. 6105-05T5, 2008 WL 680732, at *9 (unreported) (finding that employer's letter requesting input on possible accommodations required interactive process response from employee).

Triable issues of fact also exist as to whether or not further leave was a reasonable accommodation in Linton's case. At the time Linton was dismissed, his employer knew only that his eight-week injury had resulted in a twelve-week leave, and viewed in that light as an indefinite leave, accommodation would have been unreasonable. Nusbaum v. CB Richard Ellis, Inc., 171 F. Supp 2d 377, 388 (D.N.J. 2001) ("Of course, this Court recognizes that an accommodation of leave time, the end of which the employer cannot foresee, is not a required accommodation under the NJLAD."). On the other hand, Linton is correct that Gillespie admitted that a short extension of leave would have been reasonable, and Dr. Winell cleared Linton a short period after his termination. (Caldwell Dec. Ex. 15 at 61-62; Ex. 19.) It is true that Defendant did not know of Plaintiff's imminent return prior to terminating him, however this alone is not sufficiently determinative on the instant facts: in Butlemeyer, for instance, the Seventh Circuit found that the plaintiff's request for accommodation, submitted just hours after the plaintiff's termination, should have resulted in the employer re-engaging in the interactive process rather than enforcing the termination immediately. 100 F.3d at 1282. While Linton

14

presents slightly different facts than Butlemeyer—the gap was four days in his case—this Court finds that it still within the province of the factfinder to determine whether further leave under the circumstances would have been reasonable. Furthermore, in Cahill v. Parkway Insurance Co., the Appellate Division found that mere failure to provide a date certain to return to work does not violate the NJLAD. No. 5579-03T2, 2005 WL 2708087, at *4 (unreported). This Court, therefore, denies summary judgment to both parties on the issue of who failed to continue to engage in the interactive process pursuant to Plaintiff's original request for accommodation that resulted in the twelve weeks of leave formally granted by Defendant on July 18, 2005.

### 3.    Legitimate Nondiscriminatory Rationale

Defendant argues with respect to its burden to produce a legitimate, nondiscriminatory reason for terminating Plaintiff that it was forced by business necessity to replace him in order to relieve other staff. Myers v. AT&T, 882 A.2d 961, 966 (N.J. Super. Ct. App. Div. 2005); Def. Br. 18-19. This Court finds that Defendant has met its (admittedly low) burden based upon the facts asserted that other employees were required to work twelve-hour shifts in order to cover for Linton. (Curry Dec. Ex. 3 at 19.)

### 4.    Pretext

Since Defendant has elected to produce a legitimate, nondiscriminatory business rationale for terminating Plaintiff rather than admitting discrimination, the burden moves back to Plaintiff to demonstrate pretext. Jansen v. Food Circus Supermarkets, Inc., 541 A.2d 682, 692 (N.J. 1988). Pretext may be shown under the NJLAD if a plaintiff presents evidence from which "a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or

15

(2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); DeWees v. RCN Corp., 883 A.2d 387, 396-97 (N.J. Super. Ct. App. Div. 2005) (recognizing adoption of Fuentes standard). "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d at 764. Additionally, the evidence presented must be more than mere conjecture. Melick v. Township of Oxford, 683 A.2d 584, 589 (N.J. Super. Ct. App. Div. 1996).

Although Plaintiff does not expressly argue concerning pretext as he does not follow the teaching of Victor, 952 A.2d at 504, that failure to accommodate is a species of disability discrimination, this Court finds that he has successfully alleged pretext to survive summary judgment. Plaintiff presents the deposition of Eric Wolff, an employee of the Piscataway plant, and argues based upon that deposition that a reasonable finder of fact need not believe that there was a business necessity for Linton's termination as 130 other persons at the plant could have filled his position. (Pl. Opp. Br. at 38; Curry Dec. Ex. 3 at 19.) Although Defendant denies that so many Piscataway employees could have filled in for Linton, this showing at summary judgment suffices for this Court to find that there are facts in dispute from which a reasonable jury could infer that business necessity did not motivate the decision to fire Plaintiff. Plaintiff, however, has not demonstrated that the decision to terminate him was pretextual as a matter of law, and this Court denies summary judgment to both parties on the issue of pretext, and finds that there are triable issues of fact with respect to Plaintiff's claim for failure to accommodate his

16

handicap under the NJLAD.

### C. Punitive and Emotional Damages Claims

Defendant seeks to strike Plaintiff's claims for emotional damages and punitive damages, arguing that his emotional damages alleged are insufficiently severe and that the facts do not support a punitive damages claim. (Def Br. at 24-29.) Plaintiff asserts that sufficient facts exist to support a finding of emotional damages under the NJLAD, and that punitive damages are a jury question. (Def. Opp. Br. at 31-34.)

#### 1. Emotional Damages

The NJLAD requires a lesser showing than a conventional tort claim in order to support recovery for emotional distress. Tarr v. Ciasulli, 853 A.2d 921, 928 (N.J. 2004). "We hold that in discrimination cases, which by definition involve willful conduct, the victim may recover all natural consequences of that wrongful conduct, including emotional distress and mental anguish damages arising out of embarrassment, humiliation, and other intangible injuries." Tarr, 853 A.2d at 928. Similarly, the NJLAD does not require expert testimony to support emotional distress damages. Id. at 926. While Linton does not claim extended depression, the short period of depression he asserts could convince a jury to award emotional damages under the NJLAD, where embarrassment and humiliation are enough to make such a finding. Klawitter v. City of Trenton, 928 A.2d 900, 913 (N.J. Super. Ct. App. Div. 2007) (affirming jury finding of NJLAD emotional damages under Tarr.) Accordingly, this Court denies Defendant's motion for summary judgment as to Plaintiff's claim for emotional damages.

### 2. Punitive Damages

The NJLAD permits recovery of punitive damages if a plaintiff can demonstrate by clear and convincing evidence that there was "actual participation in or willful indifference to the wrongful conduct on the part of upper management" and "that the offending conduct [is] especially egregious." N.J. Stat. Ann. § 2A:15-5.12(a); Cavuoti v. New Jersey Transit Corp., 735 A.2d 548, 551 (N.J. 1999) (quoting Rendine v. Pantzer, 661 A.2d 1202, 1215 (N.J. 1995)). New Jersey law uses a functional definition of "upper management:"

> [I]t is fair and reasonable to conclude that upper management would consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers). For an employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace.

Cavuoti, 735 A.2d at 561.

This Court finds that there is no dispute as to whether or not upper management was involved in Linton's claim: Gillespie actually fired Linton, and as Director of Human Resources, was responsible for executing discrimination policies. Id. A reasonable factfinder could conclude, therefore, that Gillespie was a member of upper management who actually participated in the alleged discrimination.

The parties differ as to whether or not a jury could find "egregiousness" on the facts presented. Placed in the light most favorable to Linton, the nonmoving party on this issue, L'Oréal fired an employee after twenty-five years of service by laying in wait until his leave expired, and while being in receipt of Dr. Winell's note of August 31, 2005 refusing to simply telephone and find out how his ankle was mending and whether he could be further reasonably accommodated for a short period after the twelve weeks had ended. (See generally Pl. Opp. Br.) Several New Jersey courts have addressed the concept of egregiousness under the NJLAD. Blume v. Denville Twp. Bd. of Educ., 756 A.2d 1019, 1036 (N.J. 2000) (decision to terminate based on poor performance and interpersonal relationships not especially egregious); Kluczyk v. Tropicana Prods., Inc., 847 A.2d 23, 33-34 (N.J. Sup. Ct. App. Div. 2004) (finding egregiousness from homosexual taunting and warnings concerning seeking the advice of counsel); Maiorino v. Schering-Plough Corp., 695 A.2d 353, 368 (N.J. Super. Ct. App. Div. 1997) (finding facts sufficient for egregiousness finding in context of age discrimination against long-standing employee including targeted surveillance); Murray v. Newark Housing Auth., 709 A.2d 340, 341-44 (N.J. Super. Ct. Law. Div. Jan. 2, 1998) (finding no egregiousness from random firing).

This Court finds that although Linton has not established the level of egregiousness in Kluczyk, 847 A.2d at 29, where the plaintiff was sufficiently distressed to be found by his wife preparing for suicide, Linton has established facts sufficiently close to those in Maiorino that egregiousness should be submitted to a finder of fact. Linton, like Maiorino, was an employee of long standing with his employer, and a reasonable jury could conclude that it was especially egregious to terminate him on a date it had not expressly disclosed when it should have been engaging in the interactive process. 695 A.2d at 361. Although Linton was not singled out for

19

surveillance by his manager, as in <u>Mairoino</u>, 695 A.2d 358-60, neither was he merely subject to random termination as in <u>Murray</u>. 709 A.2d 341-44. This Court, therefore, denies summary judgment for Defendant as to Plaintiff's punitive damages claim.

## CONCLUSION

For the reasons set forth above and pursuant to the Order accompanying this Opinion, this Court denies Plaintiff's motion for summary judgment, and grants in part and denies in part Defendant's motion for summary judgment.

DATED: March 27, 2009                                           /s/ Jose L. Linares
                                                                United States District Judge